JOHN WARD *vs.* AMOS MORRIL and LUMAN WARD.

## In Chancery.

If husband and wife join in a conveyance of real estate, which the husband held
in right of his wife, the purchase money received by the husband, becomes his
personal property: and if the husband, with the avails of such estate, pur-
chase other lands, and take a deed of the same to his infant son, and hold the
same unrecorded, it remains absolutely under *his* control, and the son can
have no remedy against the father, or any other person, either for the deed
or the lands therein described.

THE Orator in his bill stated, that on the 14th day of May,
1795, William Coit was the lawful owner of Welden's Island and
Ward's Island in Lake Champlain in the County of Franklin, and
on the same day sold, and, by deed, conveyed the said Islands to
Jesse Welden, in fee, which deed was never recorded.—That after-
wards, on the 11th day of July, 1795, Jesse Welden, in considera-
tion of the sum of £85, sold and conveyed the same to the Orator,
by a good deed of conveyance, made and delivered to Luman
Ward the father and natural guardian of the Orator, (the Orator
then being a minor, about eleven years of age) to deliver over the
same thereafter to the Orator.—That the said Luman, as father and
natural guardian of the Orator as aforesaid, immediately took pos-
session of said Islands, and laid out large sums of the Orator's
money in improving the same.—That afterwards, on the 14th day
of September, 1795, the said Luman being in possession as guardi-
an as aforesaid, let the premises by lease to Amos Morril of St. Al-
bans in the County of Franklin, to hold the same until the 7th day
of October, 1806.—That Luman Ward received of the said Mor-
ril for the use of the premises, about $400, for which he has never
accounted with the Orator.—That afterwards, the said Amos Mor-
ril, well knowing the right of the Orator, combining with D. Baker,
administrator of the said J. Welden, then lately deceased, did fraud-
ulently procure the said deed from William Coit to Jesse Welden
to be delivered up to said Coit.    And the said Coit on receiving a
bond of indemnity from the said Morril, did, on the 10th day of
January, 1798, execute to the said Morril a deed of conveyance of
the said premises, which deed was acknowledged and recorded in
the proper office—That afterwards, (no date) the said Morril, by

false representations, induced the said Luman to deliver up to him *Franklin,* the said Morril, the said deed from J. Welden to the Orator, and at December, the same time promised to convey the same premises to the Orator, 1811. when he should be thereunto requested. The bill then charges J. Ward *vs.* that Morril refused so to convey the premises, but claimed and held Morril and L. Ward. the same against the Orator, praying an account, relief, &c.

To which bill the defendant, Morril, answered—That in the year 1796, he, the defendant, gave a receipt to the Sheriff of Franklin County, at the request of Luman Ward, for a number of cattle taken on an execution of A. Hastings against the said Luman.—That the cattle were left in the custody of said Luman, who otherwise disposed of the same, so that they were not turned out to the Sheriff for sale; wherefore, he, the defendant, often applied to Luman Ward for repayment, but he not being able to repay the money, proposed to the defendant to take a lease of the Welden and Ward Islands, until he should repay himself out of the rents and profits of the same. On inquiring respecting the title, Luman Ward informed the defendant, that when he purchased the Islands, he, at the request of his wife, took a deed to his son John, for fear of what might happen, as the defendant then understood, for fear of creditors.—That he did not understand or learn that Luman Ward held the same in trust for the Orator. About three years since, and not before, he heard a report that the Orator made such claim. When Luman Ward made the said proposal, he offered the defendant a lease ready drawn accordingly, which the defendant refused. Some time afterwards, Luman Ward proposed to the defendant, that Jesse Welden's deed from Coit should be given up, not having been recorded, and a deed procured from Coit to the defendant and that the defendant should give a durable lease of the premises to Luman Ward, reserving an annual rent equal to the interest of the debt then due, with an agreement that on Luman Ward's paying any sum not less than $100 at one time, the rent to be discharged in that proportion until the whole should be paid, which proposal was accepted.—That the defendant verily believed at the time, that the said Luman Ward had a just right so to dispose of the premises.—That some time after, the defendant and Luman Ward together had a conversation with said Coit, who agreed upon receiving the deed which he had given to Welden, to

*Franklin,*
December,
1814.

J. Ward
*vs.*
Morril and
L. Ward.

make a deed of the premises to the defendant, which he then, or soon after did ; and the defendant executed a lease to Luman Ward agreeably to his proposal. He does not recollect that the deed to Welden was then given up to Coit, or that he gave to Coit a bond of indemnity, and cannot say that he ever saw the deed from Welden to the Orator, and knows not where it is.—That he does not recollect that he received from D. Baker, administrator of J. Welden, the deed from Coit to said Welden, or that he ever conversed with him on the subject, until about two years ago, and since the commencement of this suit. He denies that he ever promised to convey to the Orator.—That in the spring of the year 1804, the said Luman Ward proposed to change the lease of the Islands from himself to his son John, the Orator; and as the Orator then had a family, and was doing business for himself, the defendant supposing him to be of full age, consented. The old lease was cancelled, and he executed a lease to the Orator, the same in substance as the lease cancelled, at which time the defendant had not understood from the Orator, or any other person, that the Orator had any claim to the premises.

Luman Ward, the other defendant, answered—That he, the defendant, was not knowing to the existence of the deed from Coit to Welden, otherwise than by information from Welden and Coit.— That he, the defendant, married Mary, his present wife, in Guilford, in the State of Connecticut.—That at the time of their marriage she was seized and possessed of real estate of the value of about $1500, in her own right. A short time after the marriage they sold that estate, and with part of the price, $234, purchased a farm in Georgia in the County of Franklin, a deed of which was made to Mary his wife. The remaining part of the price was principally laid out in buildings on the farm.—That some time after, he made a contract with Jesse Welden for the purchase of the Islands, and consulted with his wife about selling the Georgia farm to enable him to pay for the Islands, and to pay some debts ; she consented, on condition that the conveyance of the Islands should be made to their son John, then an infant about eleven years of age, (the present Orator.) Accordingly he sold the farm in Georgia, and his wife joined in the conveyance.—That he soon after completed the contract with Welden and took a deed of the Islands to his son

John; which deed was never recorded.—That he kept it in his possession until January, 1798, when A. Morril informed him that he (Morril) had procured a conveyance of the Islands from Coit to himself, and shewed him the deed, saying the first deed on record would hold—that his was first recorded and should hold the Islands. At the same time he offered to give a bond to execute a deed to his wife, the Orator's mother, on payment of the Hastings debt, and such other sums as should be found justly due to him, (Morril) from this defendant within three years. Whereupon, being ignorant and supposing the deed from Welden to his son would be of no use, he gave it up to Morril, and Morril executed a bond accordingly. He farther says that he conceives that he took the deed from Welden and held the premises in trust for his son.

<div style="float:right">Franklin,<br>December,<br>1814.<br><br>J Ward<br>vs.<br>Morril and<br>L Ward.</div>

There was a traverse of the answers, and the case was heard upon evidence which is stated in the opinion of the Court.

CHIPMAN Ch. J. delivered the opinion of the Court.

The points relied upon by the counsel for the Orator are,

1st. That he was, while an infant of eleven years of age, a purchaser for a valuable consideration, of the Islands in Lake Champlain, known by the name of the Ward and Welden Islands, and

2dly. That the defendants, Luman Ward, father of the Orator, and Amos Morril combined together fraudulently to defeat the Orator's title.—That the title having been derived from William Coit to Jesse Welden, and from Jesse Welden to the Orator, the deeds both from Coit and J. Welden not having been put on record, were fraudulently delivered up or destroyed, and a deed of the premises procured from Coit to A. Morril. On these grounds he prays relief, and also prays that A. Morril may be decreed to release to him the title derived from William Coit, and also prays an account, charging that L. Ward, his father, by himself, and A. Morril, his tenant, had the possession and occupation of the premises from the month of July, 1795, to ———.

It is in proof that some time in the summer of the year 1795, Luman Ward, the father, contracted with Jesse Welden for the purchase of the Islands, for the consideration of £85, which he paid to Welden and took a deed from Welden to his son John, the Orator, then an infant about eleven years of age, and the only son of Luman Ward and Mary his wife. It is in proof also, that the rea-

*Franklin,*
December,
1814

J. Ward
*vs*
Morril and
L. Ward.

son given by Luman Ward, why the deed should be executed to his son, was, that the purchase money was raised out of his mother's estate; and that Welden had purchased and held the premises by deed from William Coit; and at the time of the intermarriage the wife was seised and possessed of real estate in her own right which was sold for one thousand dollars, and that she joined in the conveyance.—That soon after Luman Ward purchased a farm in the town of Georgia in this County, and the same was conveyed by deed to the wife.—That a short time before the purchase of the premises by Luman Ward, he sold the farm in Georgia, and the wife joined in the conveyance.    There is no further proof of any circumstances attending these several transactions, except what is disclosed by the defendants, each of whom answers for himself, and the answer of neither is evidence against his co-defendants. These answers, although they have been *suffered* to pass without exceptions, are not a little remarkable.    The answer of Morril is shamefully evasive; and that of Luman Ward, the father, seems to have been drawn up advisedly, with a principal view to the son's interest, and to charge A. Morril, under an expectation, that it would be evidence against him.    Luman Ward, in his answer, among other things, says, that his wife Mary consented to the sale of the farm in Georgia upon consideration that the Islands should be conveyed to their son John; and that he conceived himself to hold the premises in trust for his son.    These conceptions may affect himself, so far as they shall be found relevant in the cause.    The other defendant, Morril, admits that at the time he became interested in the Islands, he had learnt from L. Ward that the deed was taken to his son John, the Orator, as he (Morril) understood for the purpose of securing the premises against the father's creditors.    This is all the evidence any way material to support the Orator's right. Before I apply this evidence, I will state the evidence on the other point, that of fraud, as it will be found to have a bearing on the question arising upon the first point relating to the Orator's right in the premises, especially as it concerns Morril.    The proof arises principally from the conceptions of the defendants stated by them in their answers.    The defendant, A. Morril, states that some time in the year 1796, he receipted to the Sheriff a number of cattle, belonging to L. Ward, which had been taken on an execution at the

suit of A. Hastings.—That he left the cattle in L. Ward's custody, *Franklin,* and he disposed of them, so that they were not forth-coming to sat- December, isfy the execution.—That a suit was thereupon commenced against him, (Morril) and he was compelled to pay the debt to Hastings, J Ward amounting to about $400.   This statement is supported by proof. Morril and The amount of the execution in favour of Hastings against L. L. Ward. Ward, appears to have been $394 46; besides costs.   He further states that he soon after applied to L. Ward for payment or securi- ty of what he had so paid.—That L. Ward offered to give him a lease of the Islands by way of security, which he refused.—That some time after L. Ward proposed, that the deed from W. Coit to J. Welden, not being recorded, should be given up, and a deed of the Islands taken from Coit to Morril, and that Morril should make to L. Ward some further advances, and make to him, (Ward) a du- rable lease of the premises, reserving a rent equal to the interest of the money then due; and what should be so advanced, with a right in L. Ward to extinguish the rent by payment of the princi- pal in sums not less than $100 in any one payment.—That soon after he and L. Ward had a conversation with Coit on the subject, and that either then or soon after, Coit executed a deed to him (Morril) of the premises.   There is no other proof of such propo- sal by L. Ward, or of his applying with Morril to Coit.   Morril fur- ther says, that he cannot say whether the former deed from Coit to Welden was given up—that he ever saw it, or knows what has be- come of it, or that he gave Coit an indemnifying bond.   It is, how- ever, in proof, that Welden's administrator did deliver that deed to Morril, and that Morril gave Coit a bond of indemnity.   He does not say that he gave a lease to L. Ward according to the proposal, but this is also in proof.   He goes on to state, that in the spring of the year 1804, L. Ward proposed to him to change the lease of the Islands, by giving one of the same tenor to his son John, the Ora- tor, who was then married and doing business for himself, and was, therefore, supposed by him (Morril) to be of full age.—That ac- cordingly, by mutual agreement between him, Morril and L. Ward, the father, the old lease was cancelled, he executed one of the same tenor to John the Orator, which being produced, agrees with the cancelled lease, and the terms of the proposal said to have been made by L. Ward.   On this point, L. Ward states that in Janua-

*Franklin,*
*December,*
*1814.*

*J. Ward*
*vs*
*Morril and*
*L. Ward*

ry, 1798, A. Morril informed him that he had procured a deed of the Islands from Coit, and caused it to be recorded; and that the first deed on record would hold—that is, against a former deed that had not been recorded. We may note here that L. Ward, although charged in the bill with having been concerned with the other defendant, in giving up the first deed from Coit to Welden, and procuring the second deed from Coit to Morril, neither admits nor denies any knowledge of, or part in the transaction. He says only, that Morril, in January, 1798, informed him that he had procured a deed from Coit, but without any statement, in terms, that this was the first information or knowledge he had of that transaction; nor is any exception taken to this omission on the part of the Orator. L. Ward goes on to say that Morril proposed to give a bond obligating himself to convey the premises to Mary, wife of L. Ward, and mother of the Orator, on payment of the Hastings debt, and what should appear to be justly due from L. Ward to Morril, on other accounts, within three years.—That he (L. Ward) being ignorant, and supposing that Welden's deed to John Ward would be of no further use, gave it up to Morril and executed a bond as proposed. This bond is in evidence, but he makes no mention of any debt to Morril, or lease either to himself or his son, the Orator. All this however, as has been observed, has been proved, and seems to shew the nature of the transaction between the defendants themselves, and the inducements under which they acted. The inducement to Ward appears to be the payment of a debt, which we ought to suppose he was anxious to discharge, and to Morril, to obtain security, and that alone; for he gave two chances of redemption, first on the payment of the debt within three years, then a chance to extinguish the rent reserved on the lease at any future day or days. This was in the nature of a legal right of redemption, and which could not be foreclosed. If we add to this the cautious silence of Luman Ward, respecting his previous knowledge that the Welden deed had been given up to Coit, and a deed obtained from Coit to Morril, there is sufficient proof, as the matter stands between the defendants themselves, that he (L. Ward) did consent to that transaction and had determined to abandon his first intention in favour of his son, and to exercise his own power and right over the estate.

'The question first to be decided is, was the Orator a purchaser
for a valuable, or, as to him, any consideration, with a vested right, or if not a purchaser for a valuable or other consideration, did the transaction amount to a voluntary conveyance, or to a pure gift to
the son, completed by an actual investment of right in him? If this
be decided against him, it will be unnecessary in this case, to make farther inquiry respecting the fraud which has been alleged.

In deciding this question, it is material to consider the situation of the parties. The father was seised of real estate in right of his wife. He sold this property, the wife joining in the conveyance, and as he received the purchase money, it became both at law and in equity his personal property. It is true the money arising on such sale, might with the consent of the husband, be vested in trustees for the use, or to be at the disposal of the wife, and thereby the marital rights of the husband respecting it, effectually barred or controled. But, from any thing that appears, nothing of the kind was done at that time, or intended to be done. Afterwards, it is true, the farm in Georgia was, on the purchase, conveyed to the wife, which, though a proper act as between them, was merely voluntary in the husband. On the sale of the Georgia farm, in which the wife also joined, it does not appear explicit from the answer of L. Ward, that there was any stipulation between the husband and wife, or intention to reserve any part of the avails to the sole use of the wife, or to be under her control or direction; but it is in proof that on the purchase of the Islands, L. Ward gave as a reason why the deed of conveyance should be made to the son, that the purchase money was raised by a sale of the property of the wife; and that she wished the conveyance to be so made.—This also, as it relates to the wife as well as to the son, was a mere voluntary act of the father. For although the deed purported a consideration advanced by the infant son, who was then only eleven years of age, yet, in fact, it was advanced by the father, and between the father and son was as much a voluntary act, as though he had taken a deed from Welden to himself, paying the consideration with his own money, and then on the same consideration made a deed of the same premises to his son, which, although if carried into complete effect would have been good between the father and son, yet would not have been good and valid against creditors; nor would it

if retained incomplete in the hands of the father, have been good against a subsequent purchaser. Now had L. Ward taken a conveyance of the premises to himself, and then made a deed of conveyance to a third person, a stranger, without any consideration in fact, but expressing a consideration, and retained that deed in his own hands unrecorded, it would still have remained in his own power; he might have permitted it to go into effect, or he might have refused: Such third person could have no right, either in law or equity, to compel him to carry it into effect by delivering the deed, or by causing it to be recorded. I can see no equitable or legal distinction in the cases: the act in this case was equally *in fieri,* and the right of withholding the final effect the same. The circumstance, that in this case, the title was never so vested in the father, that merely by destroying or withholding the deed, he would retain or vest any legal title in himself, makes no difference as to his power over his voluntary act. It has already been seen that any right attempted to be derived from the property of the wife wholly fails;—that property being vested in full right in the husband: it fails as a contract between the father and mother who were *Baron and Feme.* A *Feme,* during her coverture, has no will of her own— no power of consent. Every contract between *Baron and Feme* is absolutely void. In this case the mother as a wife under coverture, derived from the supposed contract, no right against the father her husband; and surely, it cannot be contended that the son, as heir expectant to his mother, should, during the life of both father and mother, derive a right through her against the father, and that what was no right in her should spring up into a right in the son. If the father retained it in his power, he might still give effect to his former intentions, or he might on a Bill in Chancery submit, as he seems ready to do in this case, that it should be so decreed; but if the father had intentionally transferred the right, or suffered or procured it to be passed to a third person, although as it relates to the father he might have been defrauded or imposed upon, yet he alone would have a claim to redress. We cannot, on this bill, inquire whether it was done on a fair inducement, or whether obtained by fraud and imposition. It is sufficient that the father did now intend to exercise the power which he had to retain to himself the use, or rather the avails of the property, which he once intended for

the son. The circumstance that the title was never so in the fa- *Franklin,* *December,* *1814.*
ther, that merely by giving up or destroying the deed made to the
son, the property would either remain or become vested in him,
makes no difference.

J. Ward
*vs.*
Morril and
L. Ward.

It has been urged that the father might have been acting in two
capacities—first for himself, in agreeing to make the contract for
the son, and secondly as guardian, consenting for the son, and re-
ceiving the deed to his use, and so all his personal right and power
over the property was gone. But this is not so.—He was still
bound only to himself, and such self obligation, if I may use the ex-
pression, is nothing more than a revokable intention. Had he held
the deed in his own power until the son came of age, the son could
not have compelled him to deliver it up, or to have completed it to
the use of the son, any more than though it had been a deed of his
own property executed by himself and retained in the same man-
ner.

The bill must therefore be dismissed, but without costs.